VIRGINIA:

## IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX

| | |
|---|---|
| MELINDA L. CARMEN, )<br><br>       Plaintiff, )<br><br>v. )<br><br>STATE FARM FIRE AND CASUALTY )<br>COMPANY )<br>Peggy Echols )<br>State Farm Fire and Casualty Company )<br>1500 State Farm Blvd )<br>Charlottesville, VA 22909 )<br><br>WATTS WATER TECHNOLOGY )<br>CT Corporation System )<br>155 Federal St., Suite 700 )<br>Boston, MA 02110 )<br><br>WATTS REGULATOR COMPANY )<br>CT Corporation System )<br>155 Federal St., Suite 700 )<br>Boston, MA 02110 )<br><br>WOLVERINE BRASS INCORPORATED )<br>Lloyd W. Coppedge )<br>2951 HWY 501 E )<br>Conway, SC 29526 )<br><br>& )<br><br>SERVICEMASTER OF FAIRFAX, INC. )<br>Stephen C. Simmons )<br>43676 Trade Center Place #155 )<br>Dulles, VA 20166 )<br><br>       Defendants. ) | **JURY TRIAL REQUESTED**<br><br>2014-10600 |

FILED
CIVIL INTAKE
JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

## COMPLAINT

EXHIBIT

2

COMES NOW, the Plaintiff, MELINDA L. CARMEN, ("Ms. Carmen"), by counsel, and hereby states the following in support of her Complaint against the Defendants, STATE FARM FIRE AND CASUALTY COMPANY, ("State Farm"), SERVICEMASTER OF FAIRFAX, INC. ("ServiceMaster") AND WATTS WATER TECHNOLOGY, WATTS REGULATOR COMPANY and WOLVERINE BRASS INCORPORATED ("collectively, Watts") on the grounds as hereinafter set forth.

## Parties and Jurisdiction

1.     Plaintiff, Ms. Carmen, is a resident of Fairfax County. Her permanent residence is located at 1400 Ingeborg Ct., McLean, Virginia 22101, which is an approximately 7,900 square foot luxury dwelling located within a few miles of Washington, D.C.

2.     State Farm is and was at all times herein mentioned, a company incorporated in accordance with the laws of the State of Illinois.

3.     Watts is and was at all times herein mentioned, the entity which designs, assembles, manufactures, markets and provides the plumbing parts at issue in this case. It is composed of Watts Water Technology (a Delaware corporation), its subsidiary Watts Regulator Company (a Delaware corporation) and Wolverine Brass Incorporated (a South Carolina company), which also acts as the distributor.

4.     ServiceMaster is and was at all times herein mentioned, a company incorporated in accordance with the laws of the State of Virginia, which specializes in handling water damage claims in the northern Virginia region.

5.     The Fairfax Country Circuit Court has subject matter jurisdiction as all relevant transactions occurred within the Commonwealth of Virginia.

6.     The Fairfax County Circuit Court has personal jurisdiction over the Defendants pursuant to Va. Code Ann. §8.01-328.1, as they have transacted business in the Commonwealth of Virginia.

### Original Incident

7.     In 2004, Ms. Carmen purchased the dwelling located at 1400 Ingeborg Ct., McLean, Virginia 22101.

8.     Since the purchase in 2004, Ms. Carmen had the property covered by a State Farm homeowner's insurance policy, which includes coverage for the dwelling, personal property, loss of use, and other coverage.  That policy has been in effect at all applicable times relating to this case.

9.     On the evening of August 21, 2012, Ms. Carmen came home and discovered that water was flowing into all four levels of the home from an attic toilet fixture and that her home had experienced severe water damage.

10.     At that time, Ms. Carmen promptly shut off the water main valve to her home in an effort to halt the flow of water from the fixture.

11.     As she later discovered, the flooding traced back to a defective Watts Toilet Connector on the attic level of the home, which connected the attic toilet to the plumbing of the house. This connector had failed on or about August 21, 2012 and caused water to flood throughout the home.

3

12.     On the evening of August 21st, upon discovering the flooding, Ms. Carmen called the local Fire Department, which suggested she call her insurer.

13.     Ms. Carmen then promptly contacted State Farm's "after hours" service, which dispatched ServiceMaster to her house.

### Initial Response from State Farm and ServiceMaster

14.     From the time that ServiceMaster arrived at the scene, they were in direct contact with State Farm who directed all their actions.  Together they supervised and performed all clean-up and drying actions at the residence, which not only failed but actually exacerbated the water damages.

15.     Over the next several days, Ms. Carmen urged that the soaked items inside the residence be removed from the home, including vanities, drywall and flooring.  This request was repeatedly refused by Service Master and State Farm.  She also noted that a strong odor was developing in the house, apparently related to the moisture.  Her observations were ignored by Service Master and State Farm.

16.     Instead of removing the wet items and investigating the foul odors, ServiceMaster, under the supervision and instruction of State Farm, attempted to minimize the amount of property needed to be replaced by refusing to discard the soaked items and instead relying on fans to dry them out.

17.     In attempting to "dry out" the residence in the days after the flooding, ServiceMaster and State Farm also failed to turn off the HVAC, but instead permitted it to remain operating.  During this time, Ms. Carmen had multiple conversations with State Farm and ServiceMaster about whether the fans and HVAC should remain

4

running. She was not only assured that it was safe and effective for HVAC and fans to keep operating but State Farm insisted the fans continue to operate.

18.    On or about August 23, 2012 and at times after that, State Farm specifically instructed Ms. Carmen to set the HVAC to 78° and to keep both the ServiceMaster fans and the HVAC system operating. As a result, the forced air from the fans and HVAC system were effectively spreading water damage from the initial flood, by blowing the resultant mold spores all throughout the house.

19.    For at least eight days (August 21st - August 28th), while the home remained wet and the soaked items stayed in their original location, the fans continued to blow and the HVAC system continued to run without regard to industry standards for drying out a flooded property.  During this time, the mold from the August 21st flood spread to all corners of the house.

## Ms. Carmen is Exposed to Toxic Mold

20.    Ms. Carmen lived and slept in her home from August 21, 2012 through and including the evening of August 28, 2012.  Neither State Farm nor Service Master advised her to leave the residence, even though they both had knowledge that dangerous and toxic mold existed.

21.    On August 29, 2014, Ms. Carmen woke up with several health issues, most notable of which being a closing up of her throat and trouble breathing.

22.    She left the home immediately after being informed by State Farm that toxigenic mold had formed throughout the house.

23.     After having significant trouble with daily functions, Ms. Carmen visited two doctors who immediately diagnosed her as having neurotoxicity, which diagnosis was later confirmed by testing.

24.     Ms. Carmen was advised to not enter her home for health reasons.  She has not lived in her house since August 29, 2012, at which time she was told that her home is not safe for human residency.  On or about August 29, 2012, an environmental engineer confirmed with State Farm, after his independent inspection, that mold had spread everywhere, the home was likely a "total loss" and Ms. Carmen could likely never reside in the home again due to the flooding.

25.     Ms. Carmen has been unable to live in the house, or use the house or its contents since August 29, 2012.  Instead, she has been living with family or in rental housing, which has caused her significant expense and continues to suffer adverse health issues.

26.     She has also continued to feel the effects of the neurotoxicity.  She was put on a detoxification protocol until late March 2013.

## Negligence of Watts

27.     Watts is a plumbing parts manufacturer and distributor, as described above.  Between 1999 and 2009, Watts designed, manufactured and sold Toilet Connectors with defective acetal Coupling Nuts.  These defective acetal Coupling Nuts led to the Toilet Connectors failing and causing flooding in residences.

28.     The flooding that occurred in Ms. Carmen's home was a direct and proximate result of the failure of the toilet connector manufactured and sold by Watts

6

and installed in her house. That connector was knowingly designed, manufactured and sold as defective.

29.    That toilet connector failed on August 21, 2012 which caused the massive flooding (and resulting damage including mold) referenced herein.

## Negligence of ServiceMaster and State Farm

30.    At State Farm's request, ServiceMaster came to Ms. Carmen's home to (i) conduct the clean-up and drying and (ii) salvage those items that it could.  At all times, they worked under the supervision and instruction of State Farm, which had selected them as the preferred vendor and called them to the house.

31.    Although industry standards state that wet materials should be removed immediately and fans should only be used for forty-eight to seventy-two hours, ServiceMaster (on the instruction of State Farm) disregarded this standard by failing to remove wet materials and kept a large number of fans running for eight (8) days with no containment, negative air pressure, or air scrubbers (all of which are industry standards) to mitigate the effects.

32.    In addition, ServiceMaster and State Farm also disregarded industry standards by failing to remove items from the house which had become drenched by the water intrusion.  For example, it failed to tear out walls, vanities, mirrors, flooring and other fixtures, despite repeated requests to do so by Ms. Carmen.  ServiceMaster had a duty to properly perform the services, for which it had been hired, within industry standards.  State Farm, by hiring ServiceMaster and supervising this work, had a duty to properly supervise this work.  By its substandard service and multiple errors, both

7

parties disregarded industry standards and breached its common law and independent duty of care to Ms. Carmen.

34. ServiceMaster's and State Farm's actions directly led to the damages that Ms. Carmen has experienced in this matter. In all cases, ServiceMaster's actions were directed and supervised by State Farm, which was coordinating the clean-up and drying of Ms. Carmen's house.

35. State Farm directed Ms. Carmen to follow all of ServiceMaster's directions, not to interfere with ServiceMaster's activities, to keep all fans placed in the home by ServiceMaster running at all times and failed to warn Ms. Carmen of any potential dangers stemming from the flooding incident and failed to warn her to leave the home due to potential dangers.

## Damage to Ms. Carmen's Home and Contents

36. Ms. Carmen's 1400 Ingeborg Ct., McLean, Virginia 22101 property has been left uninhabitable by the combined actions (or inactions) of Watts and/or ServiceMaster, and/or State Farm.

37. Specifically, the failure to immediately remove wet items and negligent use of industrial fans and the HVAC system, past the industry standard of forty-eight to seventy-two hours, created an environment that not only failed to stop mold growth but spread it to areas throughout the home, including the contents therein.

38. The use of the fans, unknown to Ms. Carmen, spread toxic mold throughout her house and helped multiply the amount of mold present within her home.

8

The toxic mold not only grew and produced air spores that were absorbed into the walls and floors of the home, but these spores were also absorbed into all of the personal property Ms. Carmen had at the home.

39.    A mold inspection and analysis by Acquired Home Services ("MoldAid") on September 3, 2012, found extremely high levels of toxigenic mold present. For example, MoldAid found the home still wet, visual mold throughout the house and noted that improper drying techniques caused mold throughout the house. In addition, MoldAid found extremely high levels of toxic mold in the home.

40.    Due to the nature of mold generally, the mold and mold spores continue to inhabit Ms. Carmen's home and render it uninhabitable.

41.    Additional environmental testing performed in June 2014 confirms that every level of Ms. Carmen's house still possesses dangerous levels of toxigenic mold, specifically "stachybotrys," even after remediation efforts occurred. The only way Ms. Carmen's home can be put back into its original condition is by demolishing and rebuilding the home from the ground up.

42.    The necessity of a new structure has been communicated to State Farm which has rejected any requests to demolish the house and pay for its replacement, as required by Ms. Carmen's contract with State Farm. This rejection was reiterated in a letter from State Farm dated July 17, 2014.

43.    As a result, Ms. Carmen has been left since August 21, 2012 without (i) a habitable residence, (ii) her damaged personal property being replaced, or (iii) full reimbursement of her costs for temporary residency or other ancillary needs.

9

44.    As a result of the acts (or omissions) of the defendants which are outlined herein, Ms. Carmen has suffered damages which include the total loss of her residence, the need to obtain temporary housing, the loss of her personal property that was and/or is inside her residence, discomfort and diminished quality of life, lost work-time and inconvenience, past, present and future medical costs, pain and suffering, as well as all further damages which are specified herein.

## COUNT I - PRODUCTS LIABILITY - BREACH OF EXPRESS AND/OR IMPLIED WARRANTIES
### (Watts Water Technologies, Watts Regulator, Wolverine Brass)

45.    Ms. Carmen repeats and alleges each and every allegation contained in Paragraphs 1 through 44 of this Complaint as if fully set forth herein.

46.    Defendant Watts was the manufacturer of Toilet Connectors with defective Acetal Coupling Nuts.

47.    Upon information and belief, Defendant Watts sold the defective Toilet Connectors to Ms. Carmen.

48.    Ms. Carmen used the defective Toilet Connectors in her home, without any knowledge that these products were defective;

49.    Defendant Watts expressly and/or implicitly warranted:

     i.    That the Toilet Connector was safe.

     ii.    That the Toilet Connector would perform its functions without any defect.

    iii. That the Toilet Connector would not cause any damage to the toilet it was used in, nor would it cause any damage to the home and the contents of the home it was installed in.

50. Watts further owed a duty to give adequate warnings to all purchasers or individuals in proximity to such products that such products were defective, and/or capable of malfunction and that injury and damages to property could reasonably be anticipated in light of such conditions.

51. Watts also owed certain duties to inspect or test their products to ensure that they were safe for their intended use or any reasonably foreseeable uses.

52. Watts breached the aforementioned warranties and duties upon sale of the Toilet Connectors.

53. The Toilet Connectors were unreasonably defective for the use that it would ordinarily be used, and the resulting property and other damage was a foreseeable consequence of its defect.

54. As a result of Defendant Watts' negligence, Ms. Carmen: has or will incur significant costs in demolishing and replacing her home and the disposal and replacement of its contents, remediation costs, relocation costs, temporary housing and other related costs, suffered severe health consequences, has been denied the opportunity to fully use and enjoy her home and personal property, has lost earnings, and has incurred other associated costs, including but not limited to, bills from medical treatment and testing, the cost to test and retest the home and the costs for protective gear, loss of time, inconvenience, and pain and suffering.

11

55.   The repairs to the home, costs associated with the required demolition and rebuilding of her home, property damage (including personal property), lost earnings, relocation costs (including temporary housing), inability to fully use her home and personal, costs associated with the attempted clean-up and subsequent testing of her home, medical costs, loss of time and earnings, the pain and suffering and any and all other associated costs Ms. Carmen experienced were direct damages that flowed naturally from Defendant Watts breach and for which Ms. Carmen needs to be compensated.

## COUNT II - BREACH OF CONTRACT
## (ServiceMaster)

56.   Ms. Carmen repeats and alleges each and every allegation contained in Paragraphs 1 through 55 of this Complaint as if fully set forth herein.

57.   Defendant ServiceMaster offered the Plaintiff, Ms. Carmen, emergency clean-up and drying services related to damage she incurred from flooding that occurred on or about August 21, 2012. Ms. Carmen accepted ServiceMaster's offer.

58.   Ms. Carmen entered into a legally binding contract with Defendant ServiceMaster on or about August 21, 2012 which required Defendant ServiceMaster to perform emergency clean-up and drying services at the 1400 Ingeborg Ct., McLean, Virginia property. Besides cleaning the existing water damage, the emergency cleaning and drying services were intended to prevent additional damage to the residence.

58.   Defendant ServiceMaster failed, without legal excuse, to perform its obligation to clean up or prevent further damage to Ms. Carmen's home.  Thus,

Defendant ServiceMaster materially breached the contract. This failure led to a worsening of the damage in Ms. Carmen's home, namely the spreading, rather than the quarantining, of toxic mold throughout her home and its contents.

59. As a result of Defendant ServiceMaster's breach, Ms. Carmen: has or will incur significant costs in demolishing and replacing her home and the disposal and replacement of its contents, relocation costs, temporary housing and other related costs.

60. The repairs to the home, costs associated with the required demolition and rebuilding of her home, property damage (including personal property), relocation costs, inability to fully use her home and personal and other associated costs, Ms. Carmen experienced are direct damages that flow naturally from Defendant ServiceMaster's breach of the contract and for which Ms. Carmen needs to be compensated.

## COUNT III - NEGLIGENCE
### (ServiceMaster)

61. Ms. Carmen repeats and alleges each and every allegation contained in Paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62. As the vendor charged with cleaning her home Defendant Service Master owed Ms. Carmen numerous duties, including but not limited to the following:

   a) To properly conduct the emergency clean-up and drying services;

   b) To follow all appropriate industry standards pertaining to emergency
      clean-up and drying of a flooded home, including but not limited to (i)
      the utilization of fans in drying a home, the (ii) time limits that should

13

be placed on the use of fans or HVAC systems to mitigate the spread of mold, (iii) the use of products necessary to mitigate the spread of mold, and (iv) ;

c) To establish appropriate safety precautions within the house to ensure that inhabitants of the home were not injured due to any direct or indirect dangers that may arise from the flooding;

d) To not create or contribute to the creation of an unsafe condition within the home;

63.    Due to the emergency nature of the situation, the immediate response necessary and possibly dangerous nature of a flooded home, Defendant Service Master had a duty to ensure that the proper standards were followed to mitigate the dangers that could arise from a flooded home.

64.    By representing to Ms. Carmen that it was aware of any and all steps necessary to prevent further damage to her home from the flooding, Service Master prevented Ms. Carmen from taking essential actions to prevent damage to her home, including but not limited to:

i.   Promptly removing wet materials from her home;

ii.  Powering off her HVAC system and the industrial fans placed in her home;

iii. Removing flooring and fixtures, such as bathroom cabinets, in an effort to help facilitate the drying of her home.

14

65.    As a result of Defendant Service Master's negligence, Ms. Carmen: has or will incur significant costs in demolishing and replacing her home and the disposal and replacement of its contents, remediation costs, relocation costs, temporary housing and other related costs, suffered severe health consequences, has been denied the opportunity to fully use and enjoy her home and personal property, has lost earnings, and has incurred other associated costs, including but not limited to, bills from medical treatment and testing, the cost to test and retest the home and the costs for protective gear, loss of time, inconvenience, and pain and suffering.

66.    The repairs to the home, costs associated with the required demolition and rebuilding of her home, property damage (including personal property), lost earnings, relocation costs, inability to fully use her home and personal, costs associated with the attempted clean-up and subsequent testing of her home, loss of time and earnings, medical costs, and the pain and suffering Ms. Carmen experienced were direct damages that flowed naturally from Defendant ServiceMaster's breach and for which Ms. Carmen needs to be compensated.

### COUNT IV- NEGLIGENCE
### (State Farm)

67.    Ms. Carmen repeats and alleges each and every allegation contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68.    Defendant State Farm owed Ms. Carmen numerous duties, including but not limited to the following:

a) To properly hire, supervise, and recommend contractors and their

15

agents/employees in conducting the emergency clean-up and drying services;

b) To ensure the contractor(s) they recommend to their insured follow all appropriate industry standards pertaining to emergency clean-up and drying of a flooded home, including but not limited to (i) the utilization of fans in drying a home, the (ii) time limits that should be placed on the use of fans or HVAC systems to mitigate the spread of mold, (iii) the use of products necessary to mitigate the spread of mold, and (iv) the prompt removal or tearing out of soaked items within the house in order to facilitate adequate clean-up and drying;

c) To ensure the contractor(s) they recommend establish appropriate safety precautions within the house to ensure that inhabitants of the home were not injured due to any direct or indirect dangers that may arise from the flooding;

d) To not create or contribute to the creation of an unsafe condition within the home;

69.    Due to the emergency nature of the situation, the immediate response necessary and possibly dangerous nature of a flooded home, Defendant State Farm had a duty to ensure that the proper standards were followed to mitigate the dangers that could arise from a flooded home.

70.    By representing to Ms. Carmen that Service Master was aware of any and all steps necessary to prevent further damage to her home from the flooding, State Farm

16

prevented Ms. Carmen from taking essential actions to prevent damage to her home, including but not limited to:

    i.  Promptly removing wet materials from her home;

    ii.  Powering off her HVAC system and the industrial fans placed in her home;

    iii.  Removing flooring and fixtures, such as bathroom cabinets, in an effort to help facilitate the drying of her home.

71.    As a result of Defendant State Farm's negligence, Ms. Carmen: has or will incur significant costs in demolishing and replacing her home and the disposal and replacement of its contents, remediation costs, relocation costs, temporary housing and other related costs, suffered severe health consequences, has been denied the opportunity to fully use and enjoy her home and personal property, has lost earnings, and has incurred other associated costs, including but not limited to, bills from medical treatment and testing, the cost to test and retest the home and the costs for protective gear, loss of time, inconvenience, and pain and suffering.

72.    The repairs to the home, costs associated with the required demolition and rebuilding of her home, property damage (including personal property), lost wages, relocation costs, inability to fully use her home and personal, costs associated with the attempted clean-up and subsequent testing of her home, medical bills, loss of time and earnings and the pain and suffering Ms. Carmen experienced were direct damages that flowed naturally from Defendant State Farm's breach and for which Ms. Carmen needs to be compensated.

17

## COUNT V - BREACH OF CONTRACT
### (State Farm)

73. Ms. Carmen repeats and alleges each and every allegation contained in Paragraphs 1 through 72 of this Complaint as if fully set forth herein.

74. Defendant State Farm offered the Plaintiff, Ms. Carmen, an insurance policy which included coverage for those costs and services related to damage she incurred from flooding that occurred on or about August 21, 2012.

75. Ms. Carmen accepted State Farm's offer.

76. Ms. Carmen entered into a legally binding contract with Defendant State Farm which required Defendant State Farm to cover any and all losses flowing from the flooding event that occurred at the 1400 Ingeborg Ct., McLean, Virginia property on or about August 21, 2012 and any associated damages.

77. Defendant State Farm failed, without legal excuse, to pay for the replacement of Ms. Carmen's single-family residence once it had been rendered uninhabitable by water damage and resulting mold after the flood dating back to August 21, 2012. Nor has it paid her for the lost personal property. Nor is it paying currently for the temporary "loss of use" payments to which she is entitled. (Said payments were stopped on or about 9/30/13, although her house was still not habitable).

78. As a result of Defendant State Farm's breach, Ms. Carmen has been denied the replacement value of her home and, thus, lost the ability to purchase a new house (or enjoy a new structure on the existing site). She has also been forced to incur continued relocation costs, temporary housing and other related costs, lost earnings, and other associated costs, including but not limited to, loss of time and inconvenience.

18

79. The above losses are direct damages that flow naturally from Defendant State Farm's breach of the contract and for which Ms. Carmen needs to be compensated.

## COUNT VI – DECLARATORY JUDGEMENT
### (State Farm)

80. Ms. Carmen repeats and alleges each and every allegation contained in Paragraphs 1 through 79 of this Complaint as if fully set forth herein.

81. There is a justiceable controversy between the parties such that the Court can and should give relief.

82. The flooding of August 21, 2012 and the concomitant damages, including the resulting growth of mold in the residence are covered perils under Ms. Carmen's homeowner's insurance policy with State Farm.

83. As stated in its policy, State Farm has a contractual duty to cover all damages to Ms. Carmen's residence, including the replacement cost of her dwelling and all of the personal property that was inside the home as well as Ms. Carmen's loss of use, any personal injuries, and all other covered items. These damages are the responsibility of State Farm as her insurer.

84. State Farm is contractually obligated to cover all damages, no matter the actual source, up to the limits of the policy. In that respect, the Court should enter an order (i) declaring that State Farm, as the insurer of Ms. Carmen's home, is responsible for any and all costs that flow from the August 21, 2012 flood, which is a covered "peril" under Ms. Carmen's insurance policy and (ii) assessing the aggregate amount of covered damages for purposes of determining that liability.

19

## PRAYER FOR RELIEF

WHEREFORE, Ms. Carmen respectfully prays that this Court grant Ms. Carmen the following relief:

1.    Enter judgment in favor of Ms. Carmen against Watts Water Technologies, Watts Regulator, Wolverine Brass, State Farm and ServiceMaster, jointly and severally, for compensatory damages in the amount of SIX MILLION DOLLARS ($6,000,000.00) for all damages incurred in this action;

2.    Enter an order against State Farm requiring them to cover any and all damages to Ms. Carmen's property as identified in her policy, as well as any associated damages referenced in her policy;

3.    Any further relief deemed just and proper.

Melinda L. Carmen

BY COUNSEL

J. Chapman Petersen, Esq., VSB #37225
Jason F. Zellman, Esq., VSB #77499
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, 2nd Floor
Fairfax, VA 22030
Telephone 703-277-9704
Facsimile 703-591-9285
Counsel for Melinda L. Carmen

# COVER SHEET FOR FILING CIVIL ACTIONS
COMMONWEALTH OF VIRGINIA

Case No. **2 0 1 4 - 1 0 6 0 0**
(CLERK'S OFFICE USE ONLY)

Fairfax County

............................................................. Circuit Court

Melinda L. Carmen

PLAINTIFF(S)

v./In re: State Farm Fire and Casualty Company, et al.

DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [x] attorney for [x] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL

**Subsequent Actions**
- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [ ] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [x] Product Liability
- [ ] Wrongful Death
- [ ] Other General Tort Liability

## ADMINISTRATIVE LAW
- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

## DOMESTIC/FAMILY
- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment -- Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint - Contested*
  - [ ] Complaint – Uncontested*
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement -- Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

## WRITS
- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS
- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
- [ ] Trust (select one)
  - [ ] Impress/Declare
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

## MISCELLANEOUS
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of U.S. Currency
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify)

[x] Damages in the amount of $ 6,000,000.00       are claimed.

August 12, 2014
DATE

[ ] PLAINTIFF   [ ] DEFENDANT   [x] ATTORNEY FOR [•] PLAINTIFF [ ] DEFENDANT

J. Chapman Petersen
PRINT NAME
4010 University Drive, 2nd Floor, Fairfax, VA  22030
ADDRESS/TELEPHONE NUMBER OF SIGNATOR
703-251-5400

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 10/12